UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DEON MARQUIEST KILES,

                    Petitioner,

        v.

WILLIAM HUTCHINGS, et al.,

                    Respondents.

Case No. 2:21-cv-01437-ART-NJK

ORDER

Before the Court for a decision on the merits is a petition for a writ of habeas corpus filed by Deon Marquiest Kiles, a prisoner of the Nevada Department of Corrections ("NDOC"). (ECF No. 6.) For reasons that follow, the petition will be denied.

I.      **BACKGROUND**

After a jury trial in the Eighth Judicial District Court for Nevada, Kiles was convicted of two counts of burglary while in possession of a firearm and two counts of robbery with use of a deadly weapon on a victim 60 years of age or older. The facts established by evidence presented at trial can be summarized as follows.

In the early morning of August 29, 2016, a masked man robbed at gunpoint a 61-year-old employee working the graveyard shift at a grocery store in Las Vegas. Approximately 15 minutes later, a 68-year-old attendant in the casino area of another grocery store 2.4 miles away was also robbed at gunpoint. The attendant described the individual, who was not wearing a mask, as tall, thin, black, and wearing a beanie hat. A detective who reviewed surveillance video from both locations determined that the robberies were committed by the same individual. Upon receiving notification of a suspect

1

based on a fingerprint lifted from the scene of the second robbery, the detective compared a photograph of Kiles to the surveillance video and determined that Kiles was the person who committed both robberies. In executing a search warrant of Kiles's residence, the police found clothes and shoes similar to the clothes worn by the suspect during the robberies. The police also found a semi-automatic handgun small enough to be concealed in a pocket.

After a sentencing hearing, the trial court gave Kiles an aggregated sentence of 16 to 40 years in the NDOC (with 261 days credit for time served). The judgment of conviction was entered on June 21, 2017. Kiles appealed.

Kiles's appeal was set for oral argument before the Nevada Supreme Court, but his counsel filed a motion for continuance due to a scheduling conflict. The case was subsequently reassigned to a reconfigured panel that concluded oral argument was unnecessary and ordered the case submitted on the briefs. In January 2019, the court entered a decision affirming Kiles's judgment of conviction.

In August 2019, Kiles filed a petition for writ of habeas corpus in the state district court. The court denied the petition on the merits. Kiles appealed. In February 2021, the Nevada Court of Appeals affirmed the lower court's decision.

Kiles initiated this federal habeas proceeding on June 27, 2021. His petition for habeas relief (ECF No. 6) contains six grounds for relief, all of which have been fairly presented to the Nevada courts in his direct appeal and state post-conviction proceeding. Respondents filed an answer to the petition (ECF No. 9); Kiles, with assistance of counsel, filed a reply (ECF No. 32); and Respondents filed a reply in support of their answer (ECF No. 36). Thus, the case is ready for a decision on the merits.

## II.    STANDARD OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under

2

AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014).; *see also Miller-El*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

Because de novo review is more favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254 by engaging in de novo review rather than applying the deferential AEDPA standard. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

### III.   DISCUSSION

#### A.   Ground One

In Ground One, Kiles alleges that the process used to select the jury in his case violated his constitutional rights because the trial court, in violation of state law, required him to use peremptory challenges against seated jurors without the opportunity to question unseated jurors who would potentially

replace excused jurors. He further alleges that the trial court erred in denying his motion to strike a potential juror who indicated that his refusal to testify would be a "red flag" for her and that innocent people cannot be tricked into saying incriminating things on the witness stand. As a result, Kiles was required to use one of his peremptory challenges to remove that juror.

In addressing the issue on direct appeal, the Nevada Supreme Court held that the trial court abused its discretion by forcing the parties to exercise peremptory strikes before passing the venire for cause, but concluded the error did not violate due process because Kiles failed to show prejudice:

> Kiles contends that the district court unreasonably restricted voir dire before all the potential jurors were seated, thereby depriving Kiles of the ability to meaningfully use his peremptory challenges. We agree that the district court abused its discretion by requiring Kiles to utilize his peremptory challenges against seated jurors without the district court first questioning unseated jurors to elicit whether they could be fair and impartial; however, we conclude that the restriction on voir dire does not warrant reversal under the circumstances. *Johnson v. State*, 122 Nev. 1344, 1354-55, 148 P.3d 767, 774 (2006) (providing that the method by which voir dire is conducted "rests within the sound discretion of the district court, whose decision will be given considerable deference by this court"); *Whitlock v. Salmon*, 104 Nev. 24, 27, 752 P.2d 210, 212 (1988) ("The purpose of voir dire examination is to determine whether a prospective juror can and will render a fair and impartial verdict on the evidence presented and apply the facts, as he or she finds them, to the law given.").
>
> Pursuant to NRS 16.030(6), "[t]he judge shall conduct the initial examination of prospective jurors and the parties or their attorneys are entitled to conduct supplemental examinations which must not be unreasonably restricted." Each side is also entitled to four peremptory challenges. NRS 16.040(1). Here, while Kiles was given the correct number of peremptory challenges and was permitted to question the jurors, the district court did not examine potential unseated jurors before requiring Kiles to use those peremptory challenges against seated jurors. This process created a situation where Kiles was unaware of the comparative fairness of the replacement jurors before exercising his peremptory challenges.
>
> Thus, even though the court permitted Kiles to question potential jurors, the court's voir dire process unreasonably restricted the purpose and effectiveness of that questioning.[1] *See* NRS 16.030(6). Such an error does not warrant reversal, however, where, as here, the appellant fails to show that an impartial jury was not empaneled or any resulting prejudice. *See Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (recognizing that, so long as an

impartial jury is empaneled, errors regarding peremptory challenges do not warrant a reversal of the underlying conviction); *see also Rivera v. Illinois*, 556 U.S. 148, 160-61 (2009) (holding that, depending on the circumstances, errors regarding state-provided peremptory challenges do not warrant a reversal of the underlying conviction unless they render the criminal trial fundamentally unfair). Indeed, Kiles does not even argue that the impaneled jury was partial or that any prejudice resulted from this error and reversal is therefore not warranted.

_____

[1] In multiple previous decisions, this court has determined that the district court judge presiding over the trial in this case committed similar errors in the jury selection process. We caution the district court that the continued failure to follow established rules regarding jury selection may result in sanctions and a referral to the Nevada Commission on Judicial Discipline.

(ECF No. 6-1 at 49-51.)

The Nevada Supreme Court correctly cited *Ross* as the controlling federal law. The U.S. Supreme Court in *Ross* held that, while the Constitution guarantees a defendant the right to an impartial jury, the fact that a defendant is required to use a peremptory challenge to cure a trial court's error in denying a challenge for cause does not constitute a constitutional violation. The Court stated:

We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Ross*, 487 U.S. at 88 (citations omitted).

The Court in *Ross* also rejected petitioner's argument that he was deprived of his Fourteenth Amendment right to due process because the trial court's erroneous challenge-for-cause ruling deprived him of the full complement peremptory challenges allowed under state law. *Id.* at 89. "[B]ecause no member of the jury as finally composed was removable for cause, [the Court] found no violation of *Ross*'s Sixth Amendment right to an impartial jury or his Fourteenth Amendment right to due process." *Rivera*, 556 U.S. at 158 (citing *Ross*, 487 U.S. at 86-91); *see also United States v. Martinez-Salazar,*

6

528 U.S. 304, 307 (2000) (holding that that "if the defendant elects to cure [trial court] error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any . . . constitutional right"). The Court in *Rivera* explicitly rejected the notion that a state law error depriving a defendant of a peremptory challenge constitutes structural error requiring automatic reversal. 556 U.S. at 161.

Here, no prospective juror Kiles challenged for cause was seated on his jury. Because he has not shown that a biased or unqualified juror served on his jury, he has not shown that his voir dire did not meet constitutional requirements. *See Skilling v. United States*, 561 U.S. 358, 395 n.31 (2010) (citing *Martinez-Salazar*, 528 U.S. at 307). Thus, the Nevada Supreme Court's application of *Ross* was not objectively unreasonable, nor was its decision based on an unreasonable determination of the facts. Accordingly, this Court must defer to the state court decision and deny Ground One.

### B.    Ground Two

In Ground Two, Kiles alleges that he is entitled to habeas relief under *Batson v. Kentucky*, 476 U.S. 79 (1986), because the State used a peremptory challenge to remove the only Black male seated in the jury box. In responding to Kiles's *Batson* challenge during voir dire, the prosecutor stated that the juror gave only one-word answers, did not volunteer any information, and was "the only person who looked completely disinterested in the process." (ECF No. 11-1 at 231.) According to Kiles, two other jurors who also gave one-word answers and volunteered little information were not challenged by the State. He argues that the trial court failed to conduct the proper analysis under *Batson*.

The United States Supreme Court in *Batson* established a three-step procedure for a trial court determine if the State's use of peremptory challenges violates the Equal Protection Clause of the Fourteenth Amendment: (1) the petitioner must make out a prima facie case "by showing that the totality of the

7

relevant facts gives rise to an inference of discriminatory purpose;" (2) once the petitioner has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes; (3) "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767 (1995).

With respect to the first step, the defendant must "raise [an] inference of purposeful discrimination," also referred to as "a prima facie case of purposeful discrimination," based on three elements. *Batson*, 476 U.S. at 96-97. The Court in *Batson* stated:

> [T]he defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race[;] [s]econd, the defendant is entitled to rely on the fact ... that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate[;] [and] [f]inally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at 96 (internal quotation and citations omitted); *see Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006) (breaking down *Batson*'s first step as these three separate elements: "(1) [T]he prospective juror is a member of a cognizable racial group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race").

In addressing the issue on direct appeal, the Nevada Supreme Court held that Kiles failed at step one by failing to make a prima facie showing of a discriminatory strike. The Court stated:

> Kiles contends that the State exercised a peremptory challenge in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Proving a *Batson* violation involves three steps. *Hawkins v. State*, 127 Nev. 575, 578, 256 P.3d 965, 967 (2011); *see Purkett v. Elem*, 514 U.S. 765, 767 (1995) (summarizing the three-step *Batson*

8

analysis). In this case, we need only address the first step, whether Kiles made a prima facie case of racial discrimination. *Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006) (providing that, under a *Batson* analysis, "the opponent of the peremptory challenge must make out a prima facie case of discrimination" before the production burden shifts to the challenge's proponent to provide a neutral explanation for the challenge).

We conclude that Kiles' arguments that the juror in question did not do or say anything to set him apart from the other jurors, aside from being African American, fail to make the required prima facie showing. *See Watson v. State*, 130 Nev. 764, 776, 335 P.3d 157, 166 (2014) ("[T]he mere fact that the State used a peremptory challenge to exclude a member of a cognizable group is not, standing alone, sufficient to establish a prima facie case of discrimination under *Batson*'s first step; 'something more' is required."). The district court therefore did not clearly err in denying Kiles' *Batson* challenge and no relief is warranted on this claim. *See id.* at 775, 335 P.3d at 165 (reviewing the district court's decision on a *Batson* challenge for clear error).

(ECF No. 6-1 at 51-52.)

Kiles argues that the Nevada Supreme Court's decision denying his *Batson* claim at step one is contrary to *Miller–El v. Dretke*, 545 U.S. 231 (2005) (*Miller–El II* ). (*See* ECF No. 32 at 28-30.) The Court in *Miller-El II* noted that "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" provided relevant evidence in its analysis of Miller-El's *Batson* claim. *Miller-El II*, 545 U.S. at 241. The Court held that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.* According to Kiles, the Nevada Supreme Court erred by not conducting a comparative juror analysis, which means that this Court must review his *Batson* claim de novo. Kiles is mistaken.

Following the decision in *Miller-El II*, the Ninth Circuit held that, "because comparative juror analysis assists a court in determining whether the totality of the circumstances gives rise to an inference of discrimination," it "is called for on appeal even when the trial court ruled that the defendant failed to make a prima facie showing at the first step of the *Batson* analysis." *Boyd*, 467 F.3d at

1149. However, the court also declined to "hold that comparative juror analysis *always* is compelled at the appellate level," instead holding only that it "is an important tool that courts *should* use on appeal." *Id.* at 148-49 (9th Cir. 2006) (emphasis in the original).

Later, in *Jamerson v. Runnels*, 713 F.3d 1218 (9th Cir. 2013), the court recognized the need to conduct a comparative juror analysis that was not conducted in state court, but still held that the state court's finding that the prosecutor did not engage in purposeful discrimination is reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2). 713 F.3d at 1224. The court included the following footnote:

> Jamerson argues that the California Court of Appeal decision should be evaluated under 28 U.S.C. § 2254(d)(1) and that this court should review his claim de novo because the state courts unreasonably applied clearly established federal law when they declined to conduct a comparative juror analysis. This court has already addressed and rejected that argument. *See, e.g., Cook v. LaMarque*, 593 F.3d 810, 816 & n. 2 (9th Cir. 2010) ("[E]ven if the trial court and the California Court of Appeal did not engage in comparative juror analysis, where the relevant evidence is found in answers to juror questionnaires and a transcript of voir dire ... [s]ection 2254(d)(2) ... applies." (second alteration in original)). Although the magistrate judge believed that an intra-circuit split existed on this question, he was mistaken. *Compare id.* at 815–16 & n. 2, and [*Ali v. Hickman*, 584 F.3d 1174, 1180–81 (9th Cir.2009)] (affording deference under § 2254(d)(2) where the state courts reached *Batson*'s third step but erred in evaluating purposeful discrimination), with *Johnson v. Finn*, 665 F.3d 1063, 1068–69 (9th Cir.2011) (evaluating purposeful discrimination de novo where the California court applied the wrong legal standard at Batson's first step and thus never reached the factual question of purposeful discrimination at *Batson*'s third step).

*Id.*, n. 1. Thus, even if the state court did not conduct a comparative juror analysis, "the state court's decision will be upheld unless it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* at 1225 (quoting 28 U.S.C. § 2254(d)(2)); *see also Mayes v. Premo*, 766 F.3d 949, 960 (9th Cir.2014) ("Though we conduct the comparative juror analysis ourselves, we are still constrained by § 2254(d)(2)." (citing *Jamerson*, 713 F.3d at 1225–26)).

For reasons that follow, this Court concludes that it was not unreasonable for the Nevada Supreme Court to find insufficient facts to raise an inference that the State struck the juror in question, Kyree Grayson, on account of his race.[1] There is no dispute that Grayson is a member of a cognizable racial group and that the prosecutor used a peremptory strike to remove him. Thus, Kiles satisfied the first two elements of the first *Batson* step. As for the third element, however, the only other facts argued by his counsel in the trial court were that Grayson did not say anything on voir dire "that was out of the ordinary from any other [prospective juror]," that there was nothing about him that suggested he could not "be a fair and impartial like every other juror," and that the State waived two strikes just prior to striking him, then waived again. (ECF No. 11-1 at 230-31.) Without the trial court ruling on whether Kiles had made a prima facie case, the prosecutor offered the aforementioned reasons for the challenge and, to support his claim that Grayson was the only panel member who appeared "completely disinterested" stated: "I watched him as he sat with his head on his – or chin in his hand essentially the entire time after we were done questioning him." (*Id.* at 231.) The prosecutor also noted that there were three other Black jurors on the 14-person jury panel. (*Id.* at 231-32 )(stating with reference to the first 14 jurors, "there are three other African-Americans on the jury panel"). The only response from Kiles's counsel was that she never saw Grayson put his head down. (*Id.* at 232.) On direct appeal, Kiles argued that the State did not seek to remove two other jurors—Jackeline Espinoza and Wanda Chiscolm—who also gave one-word answers and volunteered little information. (ECF No. 14-19 at 43-46.)

The mere fact that Grayson was the only Black male on the panel does

---

[1] To the extent Kiles is basing his *Batson* claim on an allegation that Grayson was excluded because he was a Black *male,* neither the Supreme Court nor the Ninth Circuit has recognized a combined gender and race class as a cognizable group for the purposes of *Batson. See Nguyen v. Frauenheim,* 45 F.4th 1094, 1100 (9th Cir. 2022).

not, without more, raise an inference of discrimination. *See United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994). The trial court "must consider the relevant circumstances surrounding a peremptory challenge." *Id.* (citing *Batson*, 476 U.S. at 96-97). A review of the voir dire transcript confirms that Grayson, Espinoza, and Chiscolm all responded in a similar manner to questions posed to them by the trial court, the prosecutor, and defense counsel. (ECF No. 11-1 at 172-87.) None of Grayson's answers raise a concern that he would be more likely to lean toward the defendant if selected as a juror. In addition, the responses from the three potential jurors do not disclose any personal attributes or experiences that suggest that Grayson might have been a less desirable juror, from the State's perspective, than the other two.

However, the State cited not only Grayson's responses to questioning, but also his body language in arguing that he was the only potential juror who appeared "completely disinterested in the process." When a prosecutor proffers a juror's demeanor as a race-neutral reason for a peremptory challenge, "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). "[T]hese determinations of credibility and demeanor lie peculiarly within a trial judge's province," and "in the absence of exceptional circumstances," the reviewing court must defer to the trial court. *Id.* (internal quotation marks and citations omitted). When defense counsel claimed that she never saw Grayson put his head down, the trial court stated: "He did so. And I saw him put his head down. But I don't see that as a racial bias and the *Batson* challenge is denied...." *Id.* at 232. Thus, the record shows that the trial judge accepted the prosecutor's assessment of Grayson's demeanor and concluded that it was a valid race-neutral reason for the peremptory challenge. Kiles does not cite any exceptional

12

circumstances showing that the conclusion is unworthy of deference.

The fact that there were three Black jurors on the 14-member panel when Kiles made his *Batson* challenge is another factor supporting the state court's denial of the challenge. *See Gonzalez v. Brown*, 585 F.3d 1202, 1210 (9th Cir. 2009) ("The fact that African–American jurors remained on the panel may be considered indicative of a nondiscriminatory motive.") (internal quotation marks and citation omitted). At that point, the prosecutor had waived three peremptory strikes, any of which could have been used to remove another Black juror. (ECF No. 11-1 at 183, 189, 220.)

Finally, returning to the comparative juror analysis, the court must "compar[e] African American panelists who were struck with those non-African American panelists who were allowed to serve." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir.2012). While three of the jurors on the panel were Black, it is unclear from the record who they were and whether any of them were ultimately empaneled. (*See* ECF Nos. 14-18, 14-19, 15-1.) The record does not indicate the race of either Espinoza or Chiscolm, who, Kiles argued on direct appeal, gave similar answers but were not stricken. It is unclear from the record if Espinoza and Chiscolm are appropriate candidates for comparative juror analysis.

In summary, the State court's decision to deny Kiles's *Batson* claim is entitled to deference under § 2254(d). Even if there are reasons to question the credibility of the State's proffered reasons for striking Grayson, that alone is not enough for this Court to grant habeas relief. *See Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). Instead, the state court's rejection of Kiles's *Batson* claim needs to be "so lacking in justification that there was an error well understood and comprehended in existing law beyond

13

any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. That not being the case here, the AEDPA standard of review dictates that federal habeas relief on this claim must be denied.

### C.    Ground Three

In Ground Three, Kiles contends that his rights under the Confrontation Clause were violated when the trial court admitted the testimony of a fingerprint analyst. Prior to the analyst (Sahota) testifying, Kiles's counsel lodged an objection under *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), arguing that Sahota was not "the actual analyst in this case who prepared the print for the AFIS review, who submitted it to AFIS, returned a candidate from AFIS, reviewed the AFIS match and determined that it was a match." (ECF No. 12-1 at 44.) Kiles argues that, because Sahota did not conduct or participate in any of the crucial steps of the fingerprint analysis, he (Kiles) was unable to cross-examine him about whether other candidates were potential matches or about the bias, subjectivity, or unreliability of the analyst (Gouldthorpe) who mapped the minutia of the fingerprint and compared it to the candidate list that resulted in a match to Kiles. According to Kiles, this deprived him of his constitutional right to cross-examine a witness who provided testimonial evidence against him.

In addressing the issue on direct appeal, the Nevada Supreme Court decided as follows:

> Kiles argues that the district court allowed a fingerprinting analyst to testify in violation of the Confrontation Clause because the analyst did not conduct the initial examination of the prints, prepare the prints for database search, input the prints into the database, or review or analyze the list of other candidates from the database. The State argues that the analyst offered his own independent analysis of the prints and, thus, the testimony of the person who took the prints and input them into the database was not required to satisfy the Confrontation Clause. An expert witness testifying about the contents of a report prepared by another person who did not testify "effectively admit[s] the report into evidence," and violates the Confrontation Clause, unless the testifying expert only presents independent opinions based on the report's data.

14

*Vega v. State*, 126 Nev. 332, 340, 236 P.3d 632, 638 (2010); *see State v. Lui*, 315 P.3d 493, 509 (Wash. 2014) (recognizing that Confrontation Clause precedent "guarantees the accused the right 'to be confronted with the analyst who made the certification,' . . . and not the analysts whose work might have contributed to that certification" (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011)).

Here, the testifying analyst not only certified another examiner's results, but in doing so conducted his own independent comparison of latent prints lifted with Kiles' known exemplars. Thus, Kiles' Confrontation Clause rights were not violated. *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009) (observing that this court reviews potential Confrontation Clause violations de novo).

(ECF No. 6-1 at 52-53.)

In *Crawford v. Washington*, 541 U.S. 36 (2004), the U.S. Supreme Court held that out-of-court testimonial statements could be "admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59. In *Bullcoming* and in *Melendez–Diaz v. Massachusetts*, 557 U.S. 305 (2009), the U.S. Supreme Court ruled that scientific reports could not be used as substantive evidence against a defendant unless the analyst who prepared and certified the report was subject to confrontation. 564 U.S. at 657-58, 557 U.S. at 311. In both cases, the report at issue "contain[ed] a testimonial certification, made in order to prove a fact at a criminal trial." *Id.* Then, in *Williams v. Illinois*, 567 U.S. 50 (2012), the Court addressed the constitutionality of allowing an expert witness to discuss the testimonial statements of others if those statements are not themselves admitted as evidence. 567 U.S. at 67.

In *Williams*, a case involving a sexual assault, robbery, and kidnapping, the prosecution relied on a DNA profile prepared by an outside laboratory, Cellmark, using vaginal swabs from the victim. *Id.* at 56. A police DNA analyst took DNA information from Cellmark and searched the state's DNA database for a match. *Id.* at 59. The police DNA analyst testified that the defendant's DNA profile in the state database, taken in connection with an earlier arrest,

15

matched the male DNA profile Cellmark had developed from the victim's vaginal swabs. *Id.* at 61-62. The Cellmark report on which the police DNA analyst based her testimony was neither admitted into evidence nor shown to the jury. *Id.* at 62.

In a plurality opinion, the Court held that admission of the testimony of the police DNA analyst did not violate the Confrontation Clause. *Id.* at 86. The opinion provided "two independent reasons" for its conclusion: (1) the Cellmark report was not "hearsay" material because it was not offered for the truth of the matter asserted, but instead provided the underlying facts that formed the basis of the expert's testimony (*id.* at 70-81) and (2) even if the report had been introduced into evidence for its truth, the report was not a testimonial statement because it was "not prepared for the primary purpose of accusing a targeted individual" (*id.* at 81–85). In his concurrence, Justice Thomas concluded that the Cellmark report lacked sufficient formality or solemnity to be considered testimonial. *Id.* at 103.

Several years later, and after the Nevada Supreme Court's decision in Kiles's case, the Court abrogated *Williams* by holding that an out-of-court statement presented as the basis for an expert opinion is presented "for the truth" and, as such, is hearsay that implicates the Confrontation Clause. *Smith v. Arizona,* 602 U.S. 779, 803, (2024). In *Smith*, a drug analyst relied on lab reports and notes prepared by a different analyst to provide his independent opinion at trial. *Id.* at 79. The Court held that, if a surrogate presents "out-of-court statements as the basis for his expert opinion, … [t]hose statements … come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert." *Id.* at 803. Accordingly, "a defendant has the right to cross-examine the person who made them." *Id.*  The Court remanded the case for the Arizona court to determine whether the records the expert relied upon were testimonial. *Id.*

16

In this case, the Nevada Supreme Court rejected Kiles's Confrontation Clause claim because Sahota, who testified at trial, conducted his own independent comparison of latent prints based on the information provided by Gouldthorpe, who did not testify. The court did not cite *Williams* in support of its analysis. Even so, it cannot be said that the court's decision was contrary to or an unreasonable application of clearly established federal law.

For one, the decision does not run afoul of either *Bullcoming* or *Melendez–Diaz* because those cases focused on the admissibility of scientific reports prepared by analysts who were not available for cross-examination. *See Bullcoming* (questioning the admissibility of "a forensic laboratory report … made for the purpose of proving a particular fact"), *Melendez-Diaz*, 557 U.S. at 310–11 (noting that the reports ("certificates") the state sought to present were "functionally identical to live, in-court testimony"). Here, the State did not attempt to present Gouldthorpe's report, and Sahota testified that, rather than rely on Gouldthorpe's findings, he conducted his own independent analysis of the "original evidence" – i.e., "the latent fingerprint cards." (ECF No. 12-1 at 64.)

Because no testimonial statement from Gouldthorpe was presented as evidence, *Williams* and *Smith* are more on point than *Bullcoming* or *Melendez–Diaz* in determining whether Kiles's rights under the Confrontation Clause were violated. Similar to what occurred in *Smith*, Sahota's testimony relied upon the material provided from another analyst, Gouldthorpe, who conducted the initial examination of the prints, mapped the minutia for the AFIS search, obtained a list of several candidates from the search, and determined which candidate matched the latent prints lifted from the crime scene. (ECF No. 12-1 at 44, 63, 71-72.) Unfortunately for Kiles, the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" in § 2254(d) refers to the holdings of the Supreme Court's decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

17

At the time it was issued, the Nevada Supreme Court's decision was consistent with the majority of justices in *Williams v. Illinois* who agreed that there was no Confrontation Clause violation even though an expert relied on and disclosed evidence developed by another expert when testifying about his conclusions. And, even if it cannot be considered clearly established federal law for AEDPA purposes, the fractured decision in *Williams* shows that the law was at least unsettled when the Nevada Supreme Court decided Kiles's case. *See Smith*, 602 U.S. at 789 ("Our opinions in *Williams* have sown confusion in courts across the country about the Confrontation Clause's application to expert opinion testimony." (internal quotation marks omitted)).[2] That being the case, this Court cannot conclude that the state court's resolution of Kiles's Confrontation Clause claim is not entitled to deference. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding [the issue] involved here, it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"). Consequently, Ground Three must be denied.

### D. Ground Four

In Ground Four, Kiles contends that his rights under the Confrontation Clause were violated when the trial court limited his cross-examination of Sahota. He notes that the testimony of Sahota was a crucial part of the State's case, so it was imperative that he have an opportunity to examine Sahota regarding the reliability of his testimony. He argues that the trial court

---

[2] In a case decided just prior to *Williams*, the Ninth Circuit noted that, even after *Bullcoming* and *Melendez-Diaz*, unresolved Confrontation Clause questions included "the treatment of experts testifying to their opinions based on reports not admitted into evidence, as well as the degree of proximity the testifying witness must have to the scientific test." *See Flournoy v. Small*, 681 F.3d 1000, 1005 (9th Cir. 2012). The court in *Flournoy* held that, at that time, there "does not appear to be clearly established federal law that would make the admission of [the expert's] testimony unreasonable under the standard set under AEDPA." *Id.* In his reply brief, Kiles argues at length as to why the Nevada Supreme Court's decision runs afoul of *Crawford*, *Bullcoming* and *Melendez-Diaz*; but he fails to mention *Williams* at all. (ECF No. 32 at 30-40.)

erroneously prevented him from questioning Sahota on the following topics: 1) the "Madrid training bombing" as an example of how latent fingerprints can result in the identification of the wrong person; 2) "the FBI's revamping" that occurred as a result of inaccurate fingerprint analysis in the past; and 3) the "President's Council of Advisors on Science and Technology" (PCAST) report dated September 20, 2016, which called into question the reliability of fingerprint analysis. (ECF No. 6 at 12-13.)

In addressing the issue on direct appeal, the Nevada Supreme Court decided as follows:

> Kiles argues that the district court abused its discretion in limiting his cross-examination of the fingerprint analyst. We conclude that the district court's limitation of Kiles' cross-examination was not an abuse of discretion as the information Kiles sought to illicit was irrelevant. *See Bushnell v. State*, 95 Nev. 570, 572, 599 P.2d 1038, 1039 (1979) (reviewing a district court's evidentiary ruling for an abuse of discretion). Testimony regarding individuals being misidentified based on fingerprint evidence in other, unrelated cases had no relevancy to the fingerprint analysis in the case at hand or to the analyst's qualifications, and irrelevant evidence is not admissible. *See* NRS 48.015 (providing that evidence is only relevant if it "make [s] the existence of any fact that is of consequence . . . more or less probable"); NRS 48.025(2) (deeming irrelevant evidence to be inadmissible). Furthermore, the district court allowed Kiles to reframe his questions to address the fact that fingerprint identification is fallible, which the analyst acknowledged, such that the issue was still presented to the jury via Kiles' cross-examination.

(ECF No. 6-1 at 53.)

The Sixth Amendment entitles a criminal defendant to conduct reasonable cross-examination of prosecution witnesses. *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Even so, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant …" *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "[T]he Confrontation Clause guarantees an opportunity for effective

cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* A Sixth Amendment violation occurs only if the prohibited cross-examination might have caused a reasonable jury to "receive[] a significantly different impression of [the witness'] credibility." *Id.* at 680.

When Kiles's counsel attempted to question Sahota about the Madrid train bombing, the trial court sustained the State's objection by noting that counsel had not laid a foundation and was "going into something that is not part of direct examination." (ECF No. 12-1 at 76.) Kiles's counsel argued she was "going into [Sahota's] qualifications and knowledge of the fallibility of fingerprint evidence." (*Id.*) The trial judge responded: "No, you're going into something else. So ask a different question. Appropriate question [sic] would be nice." (*Id.*)

Kiles's counsel then asked Sahota if he was familiar with the FBI's revamping that occurred as a result of false analysis that had occurred in the past. (*Id.*) Sahota responded in the affirmative and noted the example of "the Mayfield error from the FBI."[3] (*Id.*) When Kiles's counsel attempted to elicit additional information about the error, the State objected as to relevance stating that the error was committed by a different department in a different country. (*Id.*) Kiles's counsel responded that the questions addressed "the fallibility and the fact that fingerprint science is not a perfect science." (*Id.* at 77.) The trial judge sustained the objection. (*Id.*)

Kiles's counsel then asked Sahota if he was "familiar with the forensic science in criminal courts ensuring the scientific validity of featured comparison methods put out by the executive office of the President's Council of Advisors on Science and Technology dated September 20, 2016." (*Id.*) Sahota indicated he

---

[3] Brandon Mayfield was the suspect wrongfully detained in connection with the Madrid train bombing based on a faulty fingerprint match.

was familiar with the report and acknowledged that it contained some criticisms of forensic sciences. (*Id.*) Kiles then asked whether Sahota was "aware that there is an open issue concerning accuracy of fingerprint comparisons and that an average citizen might not be aware that the discipline … is not as reliable as it may seem." (*Id.*) The State objected, arguing Sahota could not have personal knowledge of what the average person knew. (*Id.*) The trial judge sustained the objection. (*Id.* at 78.)

Then the following exchange occurred:

Q:  Okay. So you are aware that the PCAST report calls into question the reliability of fingerprint analysis?

A:  There's a number of sources that question the reliability, or another way of describing it, is how we talk about the error rate, every method has an error rate. Everything from medical diagnostics and forensics sciences is no different. Even when we do everything absolutely right, there's always some small non-zero probability that the results are in error.

Q:  Okay. And the non-zero probability that you just mentioned, it's actually – there are studies that suggest that false-positive rates are as high as 1 in 18 or 1 in –

[Prosecution]:  Objection, Your Honor. Counsel is testifying.

[Kiles's counsel]:  No, I'm asking a question.

The Court:  No, you didn't ask a question. Ask an appropriate question.

(*Id.*)

Kiles's counsel then asked Sahota if he was familiar with a study suggesting false positive rates were as high as 1 in 18. (*Id.* at 79.) Sahota responded that he was not specifically aware of any such study, but if counsel could tell him the author of the study it might refresh his recollection. (*Id.*) Kiles's counsel stated it was the Miami-Dade study, but Sahota responded that he did not recall that study. (*Id.*) The trial judge then asked Kiles's counsel if she had the author of the study, to which counsel replied that it was referenced in the PCAST report. (*Id.*) The trial judge gave Kiles's counsel time to locate the

name of the author before telling her to move on. (*Id.* at 80.) Kiles's counsel was then permitted to question Sahota about the FBI's attempts to set standards to make fingerprint analysis more reliable. (*Id.* at 81.)

While it did not cite any U.S. Supreme Court cases in addressing Kiles's arguments, the Nevada Supreme Court's decision is nonetheless entitled to deference so long as neither the reasoning nor the result the decision contradicts them. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (noting that the state court need not cite or even be aware of the controlling Supreme Court cases). The trial judge's restriction on questioning about the Madrid train bombing was reasonable given Kiles's counsel's failure to establish how the fingerprinting procedures used in that case related to the fingerprinting procedures used in Kiles's case. For the same reason, the trial judge had adequate justification for cutting off Kiles's counsel when she attempted delve into the specific facts of the misidentification of Brandon Mayfield. With respect to the PCAST report, the trial judge allowed enough questioning to establish that fingerprint analysis is not infallible. As to the specific false positive rate identified in the study, Sahota testified that he did know it but might be able to recall it if counsel was able to point him to a specific study. Kiles's counsel was unable to provide that information.

In summary, the trial court imposed reasonable limits on cross-examination, and Kiles has not demonstrated how more questioning on the subjects at issue would have given the jury a significantly different impression of Sahota's credibility. Here again, the Nevada Supreme Court's rejection of Kiles's claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Accordingly, Ground Four must be denied.

### E.    Ground Five

In Ground Five, Kiles contends that his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated when the trial court did not grant a mistrial due to the State's withholding of evidence related to his tattoos. Kiles alleges that the State was in possession of photographs of his tattoos and a SCOPE report mentioning the tattoos that it did not disclose until after it had rested its case at trial. He claims the photographs were exculpatory because there were no tattoos visible on the suspect in the surveillance videos shown to the jury and both victims testified that they did not observe any tattoos on the person who robbed them.

In addressing the issue on direct appeal, the Nevada Supreme Court decided as follows:

> Kiles argues that the district court erred by denying his motion for a mistrial based on *Brady v. Maryland*, 373 U.S. 83 (1963), because the State failed to disclose evidence of Kiles' visible tattoos when the witnesses stated that the robber had no visible tattoos. To establish a *Brady* violation, Kiles must show that: "the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material." *Mazzan v. Warden*, 116 Nev. 48, 67, 993 P.2d 25, 37 (2000) (citing *Strickler v. Greene*, 527 U.S. 263 (1999)). We review a district court's resolution of a *Brady* claim de novo. *Id.* at 66, 993 P.2d at 36. We agree with Kiles that the information and evidence related to his tattoos was favorable to him, as witnesses indicated that they did not see any visible tattoos on the perpetrator and, thus, information and photographs of Kiles' visible tattoos that predated the robberies would have aided his defense.
>
> The State's failure to turn over this material exculpatory information absolutely violated *Brady*'s principle of ensuring that an accused person is treated fairly in the administration of justice. 373 U.S. at 87. The district court cured the prejudice resulting from the failure to disclose, however, by allowing Kiles the opportunity to reopen his case-in-chief to present the late-disclosed evidence and information regarding his visible tattoos. *See United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (concluding that no due process violation under *Brady* occurred where the court agreed to allow defendants to recall witnesses and reexamine them regarding the new evidence, thus giving them a "substantial opportunity to use the [evidence] and to cure any prejudice caused by the delayed disclosure"). Therefore, we conclude that the district court did not abuse its discretion by denying Kiles' motion for a

mistrial based on a *Brady* violation. *See Rose v. State*, 123 Nev. 194, 206-07, 163 P.3d 408, 417 (2007) (reviewing the denial of a motion for mistrial for an abuse of discretion).

(ECF No. 6-1 at 53-55) (footnote omitted).

*Brady* requires the government to disclose "material, exculpatory, or otherwise helpful" evidence." *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019). "Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (citing *Strickler*, 527 U.S. at 290). As the Nevada Supreme Court correctly noted, there are three elements to a *Brady* violation: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. To obtain relief – i.e., to show prejudice, a petitioner "must convince [the court] that there is a reasonable probability that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Id.* at 289 (internal quotation marks omitted).

At the conclusion of the State's case, the defense sought "to admit the non-testimonial evidence of our client's tattoos and have him display them to the jury." (ECF No. 12-1 at 172.) The State objected arguing that, without benefit of cross-examination, merely displaying the tattoos would be highly misleading to the jury because there would be no way to tell if the tattoos were obtained after the robberies were committed. (*Id.*) The trial court denied Kiles's request but allowed the parties to brief the issue overnight. (*Id.* at 178-79.)

The next day Kiles's counsel notified the trial court that the State had just provided photographs showing Kiles's tattoos, as well as the SCOPE report, and moved for a mistrial due to the State's failure to provide them before trial. (ECF No. 13-2 at 3-5.) Not agreeing that the State had violated *Brady*, the trial court denied the motion. (*Id.*) As an alternative to a mistrial, Kiles's counsel proposed

that he be allowed to produce a witness to provide a foundation for the exculpatory SCOPE report and photographs. (*Id.* at 5.) Counsel also informed the court that it would accept a stipulation to the photographs being admitted into evidence with the jury being informed that they were taken on the day Kiles was arrested. (*Id.* at 9.) The prosecutor was willing to allow presentation of the photographs but insisted that a witness be called to provide a foundation. (*Id.* at 9-10.) Kiles's counsel agreed to having a detective who was present when the photographs were taken testify about the photographs, as long as he was cooperative and willing state whether he saw additional tattoos on Kiles that day that did not appear in the photographs. (*Id.* at 11-12.) When called to testify, the detective confirmed that the photographs of the tattoos were taken on the day Kiles was arrested. (*Id.* at 16.) He also  confirmed that Kiles had additional tattoos on his forearms and hands that were not depicted in the photographs. (*Id.*)

The Ninth Circuit in *Gordon,* the case cited by the Nevada Supreme Court, held that the material evidence must only be disclosed in time for its effective use at trial. *See Gordon*, 844 F.2d at 1403 (9th Cir. 1988) ("*Brady* does not necessarily require that the prosecution turn over exculpatory material before trial. To escape the *Brady* sanction, disclosure must be made at a time when disclosure would be of value to the accused."). In addition, several Ninth Circuit decisions instruct that, where a *Brady* violation is discovered before or during a trial, the trial court has discretion to fashion a remedy other than dismissing the case or granting a mistrial.  The court has held that remedies for *Brady* violations "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Struckman,* 611 F.3d 560, 577 (9th Cir. 2010)*;* (quoting *United States v. Morrison,* 449 U.S. 361, 364 (1981) ). In one case, where there was "no dispute …  that the government failed to comply with the

requirements of *Brady*" when it failed to timely disclose evidence favorable to the defense, the court concluded that dismissal was not warranted because "all the late disclosed evidence ... was given to the jury" and the jury was instructed that it could "draw adverse inferences from the late disclosure." *United States v. Garrison*, 888 F.3d 1057, 1065 (9th Cir. 2018). In another case, the court noted that "even when a district court finds substantial *Brady* violations, prejudice to the defendants, and flagrant government misconduct, a district court has a range of options before it" and that the trial court's choice of a remedy is reviewed "for abuse of discretion, a standard of review that is 'limited and deferential.'" *United States v. Bundy*, 968 F.3d 1019, 1043 (9th Cir. 2020) (citation omitted). Although the court in *Bundy* affirmed the lower court's decision to dismiss the government's case with prejudice, it recognized that "simply showing a *Brady* violation—withholding of evidence that caused prejudice—is not a sufficient basis to dismiss an indictment." *Id.* at 1031; *see also, United States v. Cloud*, 102 F.4th 968, 981 (9th Cir. 2024) (recognizing that, rather than dismissing a case for a *Brady* violation, the court has "less drastic supervisory option(s)").

Here, the trial court refused to acknowledge that a *Brady* violation occurred but nonetheless provided a means for limiting the prejudicial impact of the State's late disclosure of the tattoo evidence. The question for this Court is whether it must defer to the Nevada Supreme Court's determination that the trial court's remedy was sufficient to cure the *Brady* violation. Kiles contends that, had the photographs and SCOPE report been disclosed earlier, he could have used them more effectively by weaving them into his defense throughout trial. While that may be the case, the defense was able to establish through the testimony of the detective that Kiles had tattoos on his arms and hands at the time of the robberies. So, the jury was made aware of Kiles's tattoos; and defense counsel emphasized in her closing argument that the victims did not

26

see any tattoos on the person who robbed them and that no tattoos were visible on the person in the videos. (ECF No. 13-2 at 38-40, 45-50.) Defense counsel could have questioned the detective more extensively about the tattoos on Kiles's forearms and hands (i.e., the ones not depicted in the photographs) but failed (or chose not) to do so.

In addition, the totality of the evidence presented a trial weighs in favor finding that the remedy provided by the trial court was adequate to cure the *Brady* violation. As noted above, the evidence of Kiles's guilt included the close proximity in time and location of the robberies, surveillance video showing that both robberies were committed by the same person, Kiles's fingerprints at the location of the second robbery, and clothes and shoes found at Kiles's residence matching the suspect. Neither victim testified that the person who robbed them did not have any tattoos. Instead, they testified only that they did not see any tattoos. (ECF No. 12-1 at 25, 94.) And, Kiles has not demonstrated that his tattoos should have been visible on the surveillance videos shown to the jury if he was the perpetrator. In sum, this Court concludes that Kiles's defense would have benefited from having the tattoo evidence before trial but is not convinced that the Nevada Supreme Court's decision denying relief under *Brady* was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts. Ground Five is denied.

### F.   Ground Six

In Ground Six, Kiles alleges that he was deprived of his constitutional right to effective assistance of counsel on direct appeal. He claims his appellate counsel was ineffective by filing a motion to continue oral argument, which resulted in oral argument being cancelled. According to Kiles, counsel unreasonably passed up the opportunity to argue important issues before the Nevada Supreme Court. The specific issue Kiles cites is the trial court's restrictions on voir dire that deprived him of meaningful use of his peremptory

27

challenges. He contends that, but for the lack of oral argument, he had a reasonable probability of prevailing on appeal.

In addressing the issue in Kiles's state post-conviction proceeding, the Nevada Court of Appeals decided as follows:

> Kiles claimed his appellate counsel was ineffective for canceling oral argument before the Nevada Supreme Court. Kiles contended counsel improperly missed an opportunity to present argument concerning the trial court's restrictions on questioning potential jurors during voir dire.
>
> However, counsel did not cancel oral argument, but rather moved for a continuance due to a scheduling conflict. The Nevada Supreme Court granted counsel's motion. *Kiles v. State,* Docket No. 72726 (Order Vacating Oral Argument, October 2, 2018). The Nevada Supreme Court subsequently notified the parties that the matter had been reassigned to a reconfigured panel and the reconfigured panel concluded that oral argument was not warranted. *Kiles v. State,* Docket No. 72726 (Order Submitting for Decision Without Oral Argument, November 26, 2018). Kiles contention that his appellate counsel canceled oral argument is belied by the record, and he did not demonstrate that his appellate counsel's motion for a continuance fell below an objective standard of reasonableness.
>
> Moreover, the Nevada Supreme Court considered Kiles' contention on direct appeal that the trial court unreasonably restricted voir dire before all the potential jurors were seated and concluded that the district court committed error. *Kiles v. State,* Docket No. 72726 (Order of Affirmance, January 31, 2019). The Nevada Supreme Court concluded Kiles was not entitled to relief because he failed to demonstrate the impaneled jury was not impartial or any resulting prejudice stemming from the district court's error. *Id.* Kiles did not identify additional arguments that counsel failed to make or demonstrate a reasonable likelihood of success on direct appeal had counsel been permitted to orally argue the issue.
>
> Because Kiles failed to allege specific facts that are not belied by the record and, if true, would have demonstrated deficiency and prejudice, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

(ECF No. 6-1 at 58-59.)

Prior to this analysis, the Nevada Court of Appeals correctly identified the controlling federal law for ineffective assistance of counsel claims – i.e., *Strickland v. Washington,* 466 U.S. 668 (1984). (*Id.* at 57.) In *Strickland*, the Supreme Court propounded a two-prong test for analyzing claims of ineffective

28

assistance of counsel: a petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

Here, the state court record supports a finding that counsel's performance did not fall below the *Strickland* standard. In moving to continue oral argument, appellate counsel requested a postponement of 14 days due to a scheduling conflict. (ECF No. 15-7.) He explained in his motion that, on the same day set for oral argument, he was scheduled to represent another client in an evidentiary hearing that had already been rescheduled twice due to witness unavailability. (*Id.* at 3.) He further explained that he was scheduled to begin a trial the following week. (*Id.*) In addition, he represented in his motion that Kiles did not object to the continuance. (*Id.* at 4.) There is nothing in the record to suggest that counsel had any reason to anticipate that the motion would result in the Nevada Supreme Court deciding to forego oral argument or that the motion factored into the court's decision. *See* Nev. R. App. P. 34(f)) (giving the appellate court discretion to "order a case submitted for decision on the briefs, without oral argument"). Counsel's conduct was eminently reasonable under the circumstances.

In addition, Kiles cannot demonstrate a reasonable probability that oral argument in support of claims on appeal would have resulted in a more favorable outcome. All the points Kiles claims counsel could have raised in oral argument were either included in counsel's briefs or known by the Nevada Supreme Court when it ruled upon his direct appeal. (ECF No. 14-19 at 31-35; ECF No. 15-1 at 6-9; ECF No. 6-1 at 49-51.) Kiles does not specify how oral argument would have had any impact on the Nevada Supreme Court's decision.

29

The Nevada Court of Appeals' rejection of Kiles's ineffective assistance of appellate counsel claim was neither an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Thus, Ground Six must be denied.

## IV.   CONCLUSION

For the reasons set forth above, Kiles's petition for habeas relief will be denied.

*Certificate of Appealability*

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.* Having reviewed its determinations and rulings in adjudicating Kiles's petition, the Court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Kiles's habeas claims.

IT IS THEREFORE ORDERED that Kiles's petition for a writ of habeas

30

corpus (ECF No. 6) is DENIED. The Clerk of Court is directed to enter judgment accordingly and close this case.

IT IS FURTHER ORDERED that a certificate of appealability is DENIED.

IT IS FURTHER ORDERED that respondents' motion for post-hearing briefing (ECF No. 41) is DENIED as moot.

DATED THIS 28th day of January, 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

31